## Morrissey et al. v. Melan et al.

*Patrick J. O'Connor* and *J. Q. Creveling*, for plaintiffs.

*Collins & Collins*, for Tom Hart.

*Frank Townend*, for Joseph C. Melan.

PINOLA, J., March 3, 1950.—On September 15, 1947, Tom Hart, realtor, was retained by the heirs of Belinda Melan to manage certain properties owned by them. He continued to manage these properties until June 1948, when he was appointed receiver by the court to collect rents from these properties.

In January 1948 Mr. Hart had appraised all of the properties, including a double house, 165-67 Moyallen Street, Wilkes-Barre, the sale of which is the subject

of this exception. At that time he fixed the value at $4,200.

In June 1948 Donald Melan and Francis Melan expressed to him their willingness to sell the property for $4,200 net to the heirs.

In August 1948 Joseph Kozak was appointed master in partition. Mr. Hart knew of this appointment. In December 1948 he testified that he talked with the master who told him that he saw no reason why he, Hart, should not be paid a commission if he effected the sale of any property.

Mr. Hart talked with all of the tenants, and especially with Mr. and Mrs. Sheridan, who occupied half of the double house in question. In January 1949 in the course of his discussion with the Sheridans he offered to lend them part of the necessary purchase money on a mortgage. He saw them on January 21st and 22nd, and again on January 25th. Miss Agnes Cavanaugh, sister of Mrs. Sheridan, called with respect to the purchase of the property on January 27th. After discussing the matter with one of Mr. Hart's agents, she was told by Donald Melan to see the master, Mr. Kozak. She called on him and paid a deposit. The master then consulted counsel for all the heirs, who approved the sale of the property at $4,500 and the court ordered it sold for that amount on February 16, 1949.

Mr. Hart, contending that he had produced the purchaser, in pursuance of his agreement with Donald Melan and Francis Melan, claims to be entitled to a commission of five percent, or $225.

At the time of the discussion between Hart and the Sheridans, the master had already filed his first report, and the court had, on January 29th, ordered a public sale of those properties which had not been accepted by the heirs, among which was the property in question.

Donald Melan, who was called, testified that he told Mrs. Sheridan to have Miss Cavanaugh see Kozak about January 26th or 27th and that Hart had nothing to do with the sale; his only duty was to collect the rents as receiver.

Counsel for the owners point to the following testimony as the only basis of his claim:

"Q. It was agreed that in the event you found a willing purchaser you were to report it to all the parties in interest for their agreement?

"A. Yes, that's right.

"Q. And of course you knew Mr. Kozak had also been appointed sometime in August of 1948 as master in partition?

"A. That's right."

They contend that Mr. Hart never submitted the offer to the other heirs because, as he says, "I didn't get that far."

Upon broad equitable grounds it seems a hardship to deny Hart's claim. Unfortunately for him, his claim is not based, as his counsel urged, on equitable principles, but upon a contract. Moreover, while the contract was with all the heirs, he informed only two of them of the offer which he had received.

While the heirs continue as owners, they are liable, no doubt, for their undertakings. In this case, however, we cannot take cognizance of any of their agreements because the court had directed its master to make the sale. Under the statute he alone could make it and receive payment for making it: Act of July 7, 1885, P. L. 257, sec. 5, as amended, 12 PS §1724.

The claim is, therefore, denied and the exceptions are dismissed.

### Plaintiffs' Claim for Counsel Fees

Plaintiffs, Gertrude Morrissey and Genevieve Yori, ask that they be allowed counsel fees for the services of Patrick J. O'Connor and J. Q. Creveling.

In the third report of the master, $3,500 was set aside for the services of these attorneys.

Seven of the eight heirs are agreeable to an allowance in this amount, but Joseph C. Melan is not, and he objects to plaintiffs' petition. The other seven have by stipulation agreed that they do not choose to accept any advantage which may accrue to them in the event that the objection of Joseph C. Melan prevails. In other words, they are absolutely satisfied that the fee asked is reasonable.

The Act of April 27, 1864, P. L. 641, 12 PS §1757, provides:

"The costs, in all cases of partition in the common pleas, or orphans' court, of this commonwealth, with a reasonable allowance to the plaintiffs, or petitioners, for counsel fees, to be taxed by the courts, or under its direction, shall be paid by all the parties, in proportion to their several interests."

This statute must be strictly construed: Novy et al. v. Novy et al., 324 Pa. 362.

The fees contemplated by the act are only such as would compensate counsel in a reasonable amount for services rendered in the actual partition and for the common benefit of all the parties in interest.

Counsel for exceptant take the position that counsel fees can only be allowed for searches, the preparation of the petition and its filing in court, that all services thereafter were adverse to the other parties and not for the common benefit, and, therefore, are not the subject of compensation.

Every case must be decided upon its own facts. The only adverse service rendered in this case by plaintiffs' counsel was the service rendered by them in compelling Donald Melan and Francis Melan, who had received rents for many years from all the properties, to make a proper accounting of those rents to the other heirs. This is a collateral matter and, while it is ad-

verse in a sense only to Donald Melan and Francis Melan, it was a service rendered for the benefit of all the heirs because it established the legal liability of Donald Melan and Francis Melan for the funds received by them.

Mr. O'Connor testified at length to the services performed by him and Mr. Creveling. He was retained by plaintiffs in the latter part of February or the early part of March 1947. His services began with several conferences with them, after which he advised an action in partition as a proper remedy. His services involved an analysis of the Henry Melan estate, the Belinda Melan estate, the Christopher Melan estate, and the Ambrose Melan estate, in order to ascertain the ownership of all the real estate involved in the partition proceedings and the interest of all the parties as set forth in the bill. There were 21 different descriptions, 16 parcels of real estate, and 31 different renting units. These required a search of the records of the orphans' court and the records of the recorder of deeds. Considerable difficulty was had in ascertaining the correct descriptions with the proper improvements located on each parcel. Several descriptions comprised only one parcel of real estate, and in others one description was divided into several parcels of real estate. Title to some of the properties came through tax sales and were bolstered by subsequent deeds. In one case there was no deed directly into the Melan estate.

Two of defendants had, since the date of death of Belinda Melan, collected rents from all of the renting units and had never given an accounting thereof. All defendants had at various times exclusively occupied tenements of the Melan estate and had not paid rent therefor, so there had to be a thorough exploration of the status of the real estate as such, together with the relationship of all the parties in reference to it, before

the bill could be properly drawn. This was finally filed on April 26, 1947.

After the filing of the bill, Joseph C. Melan retained counsel. Many conferences were had with reference to the accounting of the rents collected by Donald Melan, another defendant. In July conferences were broken off and only one of the defendants, Joseph Melan, elected to answer the bill. His answer denied the rental value of the property exclusively occupied by him and raised the bar of the statute of limitations as to the time in which rent could be charged against his interest. He joined with plaintiffs in their prayer for partition and also for the accounting between the parties. It is apparent that there was no litigation between plaintiffs and exceptant, Joseph Melan.

It is the theory of counsel for exceptant that, as soon as he entered his appearance for his client, that ended the right of plaintiffs to counsel fees. With this we do not agree.

Plaintiffs' counsel took a decree pro confesso. Admittedly this was for the benefit of present exceptant. Later, three of the other defendants endeavored to have the decree pro confesso opened. Plaintiffs' counsel prepared briefs and argued the matter in court, and through their efforts the decree was sustained.

Further conferences were had with reference to the account of Donald Melan, and throughout all these conferences the burden was carried by plaintiffs' attorneys, and whatever results were obtained were for the benefit of all, including present exceptant.

A second petition was filed to reinstate the rule to have the decree pro confesso opened. Briefs were again filed by plaintiffs' counsel and the matter argued and again sustained. Exceptant, Joseph Melan, filed no briefs nor made any effort to sustain the decree. Certainly the result was as much for his benefit as that of any other coöwner. He himself asked that the prayer

of the petition be granted and that included the decree that partition be awarded and the incidental accounting.

Thereafter, conferences were had again with reference to the accounting of three defendants other than exceptant.

Mr. O'Connor declared: "I am able to state that every dollar saved for my two clients was also a dollar saved for all the other parties except the accountant" (Donald Melan). This includes Joseph Melan, the exceptant.

The following excerpt from the testimony is interesting:

"Q. (By Mr. Townend) I gather then you feel that during the time from April 1947 until the appointment of the master the only productive and effective work done in relation to this estate was done by you and Mr. Creveling?

"A. (By Mr. O'Connor) You can summarize it that way, Mr. Townend, from April until the broken negotiations in the estate we tried to get the allowance down to fourteen thousand after those negotiations broke down and as you stated to me during the summer months you claimed Joseph Melan had been completely sabotaged, those were the exact words you used at the time, by his two brothers, from then on out, Mr. Townend, your relations as to the accounting by Donald Melan was an exact right about face, I think it was from April 1947 until August 1947."

So, Mr. Townend, exceptant's counsel, was of no help.

The testimony of Mr. O'Connor is undisputed and uncontradicted that the conferences between counsel were principally between Judge Farrell and himself, with Mr. Flanagan, Mr. Townend, and other counsel simply sitting on the side lines. They all looked to petitioners' counsel to carry on.

The stipulation of the final settlement of all accounting was prepared by plaintiffs' counsel without any assistance of any other counsel. This obviated the necessity of long drawn out hearings on the exceptions. It was the basis of the ultimate decree in partition and the basis for the report of the master. It took care of all the incidental matters between the parties. This service was for the benefit of all parties. Exceptant benefited by every dollar that was obtained from Donald Melan and Francis Melan.

Exceptant created a need for some services by plaintiffs' counsel. Although the heirs had agreed that the rents were to be collected by Tom Hart, Joseph Melan, this exceptant, did not keep his agreement, but revoked it and began collecting rents and managing the property himself without notice to any other party in interest. He collected $730 rent in a short time and expended $731 during the same period, without the consent of any of the other coöwners. It became necessary to have a receiver appointed and this work was done by counsel for plaintiffs. During his administration, Tom Hart, as receiver, turned over $6,500 from rents.

Two of the parties agreed to take certain properties and pay therefor in cash, but they were unable to do so and plaintiffs were obliged to accept owelty in lieu thereof. This was detrimental to plaintiffs and beneficial to all the other heirs. This involved additional work for plaintiffs' counsel in examining the law of owelty to determine whether it took precedence over mortgages, judgments, etc.

One of the defendants, to wit, Francis Melan, had outstanding a judgment against him which was prior to the suit in partition. Plaintiffs could have upset the whole procedure because of the failure of two of the coöwners to comply with their agreement, but counsel

for plaintiffs worked out a scheme whereby this exception and waste of money was obviated.

Counsel for plaintiffs drew up the decree of partition without the aid or assistance of any other counsel representing any of the parties.

We cannot agree with exceptant that as soon as the parties engage individual counsel, who file appearances, the services of plaintiffs' counsel for the common benefit cease. Who would proceed with the partition after that date? Who would take the decree pro confesso, and who would argue to sustain it? Who would draw the stipulation with reference to the accounting? On whom would fall the duty of having a receiver appointed? Who would draw the decree awarding partition? In this case, who would defend against the claim of Tom Hart for commission in connection with one of the sales, if not counsel for plaintiffs?

The total amount in this estate is $130,321.87. If we deduct from this amount rental credits and payments, the real estate involved was worth $96,375. The amount reserved for counsel fees, to wit, $3,500, is less than three percent of the greater total and it is 3.63 percent of the lesser total.

Judge Gest said, in Bergdoll's Estate, 25 Dist. R. 102:

"The allowance of counsel fees is always, . . . a subject of delicacy, if not difficulty, inasmuch as it depends upon a number of factors, not merely the size of the estate, but also the extent of the labor of counsel, the responsibility assumed by him, the advantage or benefit derived by the estate from his services, and as well the professional standing and reputation of the claimant. The auditing judge who hears the testimony in the first instance is far better qualified to arrive at a just and accurate estimate than the court in banc; and it is not enough that another judge, on the same

testimony, might arrive at a different conclusion; manifest error must be shown to exist."

This same rule was applied in partition by Lamorelle, P. J., in Kujack's Estate, 4 D. & C. 414.

While, "it is competent for the court to exercise independent judgment and determine the same upon a consideration of the whole case as developed on the record without being bound to accept the opinion of witnesses" (Dent v. Foy, 97 So. (Ala.) 627; Robbins v. Weinstein, 143 Pa. Superior Ct. 307, 314), in this case we have the benefit of two distinguished members of our bar who have had considerable experience in partition during the last 40 or 50 years. Former Judge M. F. McDonald and Richard B. Sheridan both testified that in their opinion the sum of $3,500 was reasonable for the services performed.

Exceptant produced no testimony whatever as to what the services were reasonably worth. He restricted his efforts to an attempt to require the other witnesses to fix a fee for the services up to the date of the filing of the bill or of the filing of the appearances by counsel for the individual heirs. This we refused to permit because in our opinion other and extensive services were performed by plaintiffs' counsel after that date. In our opinion, a lawyer need not charge for separate parts of his services if they all relate to one subject matter: 7 C. J. S. 1109, §203; Howley v. Fredricy, 197 Wash. 311, 85 Pac. (2d) 259.

This estate involved a large number of properties and a considerable responsibility on plaintiffs' counsel.

Comparing only the size of the estate, because the other elements vary widely, we have in mind that in Wilson v. McHale, 61 D. & C. 444, the net amount of the estate was less than $20,000 and the court allowed a fee of $750, although the proceedings after taking the bill pro confesso, were adverse.

In Volkwein v. Volkwein, 90 Pitts. L. J. 144, where the proceeds from the sale of the property amounted to $7,969.68, the court allowed counsel fees of $750.

And, in Loew's Estate, 76 Pitts. L. J. 450, a case of partition proceedings in the orphans' court, counsel fees of $2,500 were allowed where the value of the property was $50,000.

We are satisfied that for the services performed by Mr. O'Connor and Mr. Creveling for the common benefit of all persons in the estate, the sum of $3,500 is fair and reasonable.

Accordingly, we dismiss the exceptions of Joseph C. Melan, and we award to plaintiffs the sum of $3,500 for counsel fees.

Joseph C. Melan, in connection with his exceptions to plaintiffs' request for counsel fees filed June 16, 1949, has agreed and consented that the decree entered June 6, 1949, shall for all other purposes be treated as a final decree and that the master shall "perform and do all things required of him in said decree."

Likewise, all of the other parties by written stipulation filed June 10, 1949, gave consent to the entry of the decree as a final decree and "the master (was) therefore requested specifically to perform and do all things required of him in said decree. . . ."

In pursuance of these agreements, the master has delivered deeds for all the properties, and all of the required owelty payments have been made.

Therefore, we enter the following

### Decree Nisi

Now, March 3, 1950, the master's third and interlocutory report, including return of public sale and return of private sale, having been duly read and considered, it is hereby ordered, adjudged and decreed:

1. That this report and returns of sale and all things done thereat are hereby confirmed and approved.

66

2. That exhibits A, B, and E, attached to the report, are hereby confirmed and approved, subject to the provisions of the twelfth paragraph of the report.

3. That the execution and delivery of all deeds for properties described in the fifth paragraph of the master's first interlocutory report as nos. 9 and 19 to Gertrude Morrissey; nos. 6 and 11 to Genevieve Yori; nos. 3, 8, 10, 12 and 18 to Joseph C. Melan; nos. 2, 13, 13A, 14 and 17 to Teresa C. Melan; nos. 4 and 7 to Francis E. Melan; nos. 1 and 5 to Donald Melan; and no. 15 to Teresa C. Melan, Francis E. Melan, and Donald Melan, jointly, are approved.

4. That all of these properties are free and clear of all owelty charges.

5. That exhibit C, being the master's first account and schedule of distribution, is hereby confirmed and approved, subject to the twelfth paragraph of the report, and he is required to make distribution in accordance therewith.

The prothonotary is ordered and directed to give notice to the parties, or their counsel of record, of the entry of this decree and that unless exceptions are filed within 10 days the decree will be entered as the final decree, as of course.